McKinney, J.,
delivered the opinion of the Court.
The decree is correct, in holding that the tract of land sold by Porter to Edwards, is subject to the satisfaction of complainant’s debt, upon the ground, that the *187 lien, of the attachment was fastened upon the land before the registration of the conveyance from Porter to Edwards ; and, also, upon the ground of an actual intention to hinder and delay the creditors of Porter, by that means, of which Edwards is shown to have been conversant.
The decree is also correct, in holding that the complainant was not entitled, in the state of the case, to reach the slaves sold by Nelson to Jones, the latter having died pending the suit, and the distributees of his estate, to whom the title passed, not having been brought before the Court by a revive of the suit against them. In order to contest the validity of the sale of the slaves by Nelson to Jones, which was sought to be impeached for fraud, it was not sufficient, merely to revivor the suit as to the personal representatives of Jones. The contest was with the distributees, who were the owners against all persons, except creditors.
But we think the decree is erroneous, in refusing relief as to the slaves sold by Porter to Johnson. The lien of the attachment was fixed upon the slaves some considerable length of time before the registration of the bill of sale for the slaves, from Porter to Johnson; and on this ground alone, the attachment must prevail, irrespective of the adequacy of the consideration paid for the slaves, or the absence of intentional fraud in the transaction.
We are also of opinion, that the decree is erroneous, in subjecting the tract of land sold by Nelson to Simpson to the satisfaction of complainant’s debt. The facts are briefly these: Nelson had been employed in the purchase of a large quantity of wheat, for P. D. Gates, of *188 New York. He had drawn various bills on Gates for a large amount, which the latter had accepted. In order to effect the negotiation of these bills at home, so as to use the proceeds in the purchase of wheat, Nelson had procured them to be endorsed by different persons, and among others, by 0. M. McGhee, who, in this way, had incurred liability, as accommodation indorser, to the amount of twenty thousand dollars. Gates suddenly failed', leaving said bills unpaid, and without having furnished any funds for their discharge. The failure of Gates involved Nelson, whose means were small, in utter and hopeless insolvency, having incurred liability for Gates to an amount far beyond his ability to meet. The unexpected failure of Gates, and consequent insolvency of Nelson, created a panic amongst those who had sold wheat to Nelson without receiving payment.
Nelson owned a tract of land, and a negro woman and child; and he at once resolved, as the proof shows, to dispose of this property. The proceeds of the property, distributed among all the creditors, would have been but a mere trifle to each. McGhee, who was indorser, as before stated, proposed to Nelson, that if he, (Nelson,) and the other parties who were liable on the bills before him, (McGhee,) and who were all probably reduced to insolvency by the failure of Gates, would give him available notes, or securities, to the amount of ten thousand dollars, which was only one-half of his liability on the bills, he would take up said bills, and discharge Nelson and the prior indorsers from all liability on account of the same. This proposal of McGhee’s was accepted, and thereupon Nelson, in order to enable himself to comply with this arrangement, sold his tract of land to the de *189 fendant, Simpson, at the price of six thousand dollars, which is proved to have been a fair price. Simpson, at the time of his purchase, is shown to have had full knowledge of the purpose for which Nelson was selling the land. Nelson was only the equitable owner of said land, at the time of the sale. He had previously purchased it from the defendant, Stanfield, and held the bond of the latter for title when the purchase money should be paid, of which upwards of five hundred dollars remained unpaid at the time of the sale by Nelson to Simpson, and this title-bond Nelson assigned to Simpson at the time of the sale.
By the agreement, Simpson was to pay the purchase money as follows: He was to discharge the balance of unpaid purchase money to Stanfield, which formed a lien on the land, a bona fide, debt of $1,200, due to himself, from Nelson, for wheal, was to be extinguished; and the residue, amounting to about $4,300, was to be paid in installments, at one, two, and three years, for which notes were given, bearing interest from date. And it was further agreed, that Simpson would lease said land to Nelson, (being the place on which he lived,) for the term of three years, at an annual rent of $300, for which Nelson executed his obligation.
These notes for $4,300, were immediately handed over to McGhee, in part performance of the agreement with him before stated, as his absolute property. The negro woman and child were sold to Hardy Jones, the .father-in-law of Nelson, at the price of $1,200, which is proved to have been a fair price, and his obligation for that sum was taken, and in like manner, immediately transferred to McGhee, in pursuance of the arrangement with him.
*190 The proof shows that Jones permitted the negro woman and child to remain with his daughter, (Mrs. Nelson,) to wait on her.
With all the efforts of Nelson, and the other prior indorsers, only about the sum of $8,000, in notes and securities, could be raised for McGhee — less than had been stipulated for; yet he accepted this amount, leaving himself subject to a loss of $12,000, upon his purely accommodation indorsements.
Now, what is there to be found, in all this transaction, which, in strictest law, or even in morals, can be regarded as blameworthy on the part of Nelson or Simpson ?
Sudden ruin had fallen upon Nelson, without fault of his own, by the unlooked for insolvency of Gates, and what did he do? Did he concoct some secret scheme, to place his property beyond the reach of creditors, with a view to future benefit to himself and distressed family? Not so. His very first and instantaneous impulse, on hearing of the disaster that was to crush him, was, that of a strictly just and generous man — to give up, at once, without persuasion, or the coercion of law, everything in the shape of property he possessed, for the benefit of those who were not, strictly speaking, his creditors, but who, through his agency, had been induced to assume a heavy responsibility for another primarily, but for him contingently.
But, inasmuch as the small amount of property possessed by him would have been but a “mite" to each, if distributed amongst all who had legal claims on him, he thought fit, in the exercise of that right of preference which the law tolerates, rather to give it all to one who *191 bad been Ms most efficient and generous friend, and who, after receiving it all, was still to be loser to the amount of at least twelve thousand dollars, in' all probability. The law has no censure to denounce against such conduct, nor do the most cogent principles of casuistry condemn it.
The circumstances relied on, as “badges of fraud,” are of no force when applied to the present case. The declaration of Nelson, that he would dispose of his property, was coupled with the distinct expression of a determination to appropriate the proceeds to the sole benefit of creditors. This was the avowed motive of the sale, and the purpose was promptly and faithfully executed.
The fact that the property was sold to his relation, by affinity — though in general suspicious — casts no shade over this transaction. A sale was indispensable, in order to a compliance with the liberal proposal of McGhee: The property was sold at its fair value; and it is not intimated in the record, that a sale could have been made to any other person, at the time, on better terms, or even on any terms.
Nor is the objection, as to the length of the credit, any more weight. The sale was made on the best terms practicable, the notes, though on time, were to bear interest from date, and McGhee was willing to accept them in place of money in hand. These facts obviate all objections to the length of time given for payment -of the purchase money.
The circumstance of Nelson's remaining in possession ■of the land, amounts to nothing. He remains there as he might remain any where else under a bona fide contract of written lease, and at full rent.
*192 Neither does the fact, that the father of Mrs. Nelsons, after paying for the slaves, by giving a negotiable note, which was accepted by McGhee, as cash in hand, permitted them to remain with his son-in-law and daughter, affect the complexion of the transaction. The law, strict and inexorable as it is on this subject, does not go the length of exacting, that men shall forget that they are men, or that they shall be required, either to ignore, or to abnegate the impulses and obligations of natural affections or sympathy toward the unfortunate, provided, that in their exercise, no injustice or prejudice be done to the legal rights of others.
But, it is also insisted, that the sale or transfer of his equitable interest in the land, by Nelson to Simpson, was imperative and void, as against the creditors of Nelson, by reason of the non-registration of the title bond from Stanfield to Nelson, and the assignment thereof by the latter to Simpson. This is a mistaken assumption ; the registry act has nothing to do with the case. It is true, that by the Act of 1831, ch. 90, sec. 1, “all bonds or agreements, in writing, for the conveyance of real or personal property, ” aro required to be proved and registered in the manner provided, and if not thus proved and registerd, they are declared “null and void, as to existing or subsequent creditors,” and also as against bona fide purchasers without notice. But it must be borne in mind, that it is only as against creditors of the grantor, that the instrument is void, for want of registration. This has been repeatedly held: 4 Yer., 375; 2 Hum., 476, 589. As between the parties, the instrument is valid and operative without registration. If the contest were between Stanfield, the *193 vendor, and Ms creditors, the objection that the title-bond made by him to Nelson, had not been registered nntil after the levy of the complainant’s attachment, must prevail: 10 Hum., 420. But the creditors of Nelson cannot successfully assail the transfer of his equitable interest to Simpson, by an assignment of the- title bond, which the former held on Stanfield, on the ground that neither the bond itself, nor the assignment, had been proved and registered, prior to the levy of the attachment. The equitable interest of Nelson, by force of the title bond, was complete, without registration, as against all persons, except the creditors of Stanfield, or subsequent bona fide purchasers from him, without notice; and this equitable interest he could transfer to another, either by a written assignment of the bond for title, or even by parol delivery thereof, bona fide, and upon an adequate consideration paid. To such transfer or assignment, the registry act has no application: See Willburn vs. Spofford, 4 Sneed, 699, and subsequent cases in M. S.
The sale of the land and assignment of the bond for title having been made to Simpson, in good faith, and for a full consideration paid, some weeks prior to the filing of the present bill, nothing remained in Nelson upon which the attachment could operate,
The decree will be modified, as herein indicated.